**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19-cr-00682 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| DAVONTE MCKAY | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Davonte McKay has been indicted on one count of being a felon in possession

of a firearm in violation of 18 U.S.C. § 922(g)(1). Police officers discovered the firearm when

they stopped and frisked McKay while he was moving within a group of people who had gathered

and were drinking alcohol and smoking marijuana on a Chicago street. McKay now seeks to have

the firearm suppressed, along with any other evidence derived directly or indirectly from his

search and arrest. (Dkt. No. 17.) For the reasons explained below, the Court denies McKay's

motion.

**BACKGROUND**

The Court held an evidentiary hearing regarding McKay's motion on December 4, 2019.

At the evidentiary hearing, the Government called as witnesses two Chicago Police Department

officers involved in McKay's arrest, Edward Zeman and Javier Collazo. In addition, the

Government introduced into evidence the arresting officers' body-camera footage and a map of

the area where the officers were patrolling on the night of McKay's arrest. McKay did not call

any witnesses. The following summarizes the substance of the evidence adduced at the hearing.

On the night of June 19, 2019, Zeman and Collazo were patrolling an area of Chicago's

11th Police District—their assigned district on Chicago's West Side. Both Collazo and Zeman

testified that there is a large gang presence in the district along with a substantial amount of drug

dealing. In addition, Zeman testified that several shootings and homicides had occurred in the

11th District during the period he worked there. At approximately 9:00 p.m. on June 19, an

unidentified woman approached the officers' police vehicle and informed them that there was

going to be a "repass"[1] in the area for a person who had passed away a year ago. The officers then

left the area and continued their patrol.

At around 10:30 p.m., when the officers returned to the area where they first encountered

the unidentified woman, they observed a large group of about 50 people standing in the middle of

the street. The area was illuminated by streetlights and the headlights of the officers' vehicle.

According to Zeman, the officers decided to approach the group due to their public consumption

of alcohol, the presence of marijuana, and because several people were in the street blocking the

flow of traffic. Zeman testified that as Collazo drove the officers' vehicle toward the crowd, he

observed one individual, McKay, standing in the middle of the street dressed in an all-black track

suit with a black object protruding from the front of his waistband. McKay was standing with a

woman in a yellow jacket to his left and the two were in front of a group of people.

As Zeman exited the vehicle, McKay looked in the officers' direction and tucked the

protruding object further into his waistband. He then put his left arm around the woman in the

yellow jacket and began walking around the group of people. Zeman testified that, because

McKay was wearing tight pants, Zeman was able to see that the object made an L-shaped bulge in

McKay's pants around his right thigh. This led Zeman to call out to McKay and ask if he had any

---

[1] Officer Zeman testified that he understood a "repass" to be a type of memorial service, often held on the anniversary of a person's death. While both officers testified that they believed the "repass" would be attended by gang members, they offered no credible justification for that assumption. Moreover, neither officer testified that they observed any person at the subsequent gathering who they identified as a gang member.

weapons on him.[2] McKay ignored Zeman's question and, with his arm still around the woman in

the yellow jacket, continued walking away from Zeman. At this point, McKay was behind the

group of people of which he had previously stood in front. While he walked away from Zeman,

McKay looked back in the officers' direction at least twice. Meanwhile, the other people in the

group remained where they were. Zeman then took out and turned on a flashlight, and approached

McKay. As he walked toward McKay, Zeman observed McKay turn the right side of his body

away from him, which Zeman understood to be McKay's attempt to hide the L-shaped bulge.

McKay cannot be seen on either officers' body-camera footage until the point when

Zeman exits the vehicle. The first footage of McKay comes from Zeman's body camera, and

McKay can be seen walking with his back turned to Zeman with his arm around a woman in a

yellow jacket. Zeman testified that as he approached McKay, he observed McKay's right hand

reaching toward the area where Zeman initially saw the protruding black object. To Zeman,

McKay appeared to be tucking the L-shaped object further down into his pants. Again, only

Zeman's body-camera footage has a view of McKay at that point. But in that footage, McKay's

right arm is largely out of frame or obstructed by other people while he is walking away from

Zeman. For a brief second, McKay's right arm is visible by his side. When McKay stops walking,

however, he turns his right side away from Zeman thus obstructing his right arm.

In response to McKay's movements, and just seconds after leaving his vehicle, Zeman

grabbed hold of McKay's left hand. He then reached around and grabbed McKay's right hand,

which was still tucked in his waistband. Again, it is difficult to tell the placement of McKay's

right hand from the body-camera footage but as Zeman draws near McKay, the Court can discern

---

[2] Because the audio on Zeman's body camera had not yet been activated at this point, the Court cannot
assess and declines to make any factual findings concerning the tone of Zeman's question.

a brief glimpse of what could be the black sleeve of McKay's track jacket near his lower-right side. Zeman testified that he then pulled McKay's right hand out of his waistband.

Zeman further testified that, as he restrained McKay's right hand he felt a hard metal object consistent with a firearm in the area where McKay's right hand was reaching. After feeling the object, Zeman placed both of his arms under McKay's underarms and raised McKay's arms to prevent him from reaching for a weapon. Zeman then called over Collazo to retrieve the metal object from McKay's pants. Collazo testified that he could see an L-shaped bulge in McKay's pants as he came over. Once he reached McKay, Collazo pulled out a pistol from the waistband area of McKay's pants. After McKay confirmed that he did not have a Firearm Owners Identification card or a concealed carry permit, the officers arrested him.

## DISCUSSION

McKay seeks to quash his arrest and suppress the firearm recovered by Zeman and Collazo and any other fruits of the search and seizure. Specifically, McKay contends that the officers had no reason to suspect that he was engaged in criminal activity and therefore lacked reasonable suspicion to stop him and conduct the frisk that led to the discovery of the firearm. Because the stop and frisk was unreasonable, according to McKay, Zeman and Collazo lacked probable cause to effect an arrest based on McKay's possession of that firearm.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. There are three recognized categories of police-citizen encounters, not all of which implicate the Fourth Amendment:

> The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment "seizure," but the officer

need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment.

*United States v. Scheets*, 188 F.3d 829, 836 (7th Cir. 1999). A court must apply "an objective standard to determine into which category an encounter between a citizen and police falls, *i.e.*, whether the encounter amounts to a 'seizure' for purposes of the Fourth Amendment." *Id.*

Here, the Government contends that the encounter between McKay and the officers initially was a consensual encounter that did not implicate the Fourth Amendment. Instead, in the Government's view, McKay was not seized until Zeman grabbed McKay's left hand after seeing McKay reach his right arm into the waistband of his pants. "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). Indeed, so long as law enforcement officers "do not induce cooperation by coercive means," they are not prevented from posing questions to individuals whom they have no basis to suspect of criminal activity. The question is "whether 'a reasonable person would feel free to terminate the encounter.'" *United States v. Hendricks*, 319 F.3d 993, 1000 (7th Cir. 2003) (quoting *Drayton*, 536 U.S. at 201). Relevant factors in this analysis include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.*

Based on the totality of the circumstances, the Court agrees that the officers' *initial* encounter with McKay was consensual. The encounter involved two officers on their regular patrol, neither of whom made a show of force, such as drawing their weapons. Moreover, only

5

Zeman approached McKay and he posed a single question to an individual surrounded by numerous other people on a public street. All these circumstances are characteristic of a consensual encounter. *See, e.g.*, *United States v. Holly*, 940 F.3d 995, 1001 (7th Cir. 2019) (holding that an encounter was consensual where a single police officer jogged up to the defendant with no show of force in a public courtyard and directly asked whether he had drugs or a gun and immediately received an affirmative response); *United States v. Thornton*, 463 F.3d 693, 698 (7th Cir. 2006) (holding an encounter to be consensual where three police officers addressed questions to the defendant as he came out of a gas station and none of them displayed their weapons or touched the suspect). It is true that Zeman did not introduce himself and instead posed a single accusatory question, suggesting that McKay was not at liberty to refuse to answer. *See United States v. Smith*, 794 F.3d 681, 685 (7th Cir. 2015) (concluding that a police officer's conduct suggested a lack of consent when the officer posed a "single, accusatory question to [the defendant]: 'Are you in possession of any guns, knives, weapons, or anything illegal'"). Nonetheless, simply asking an accusatory question does not automatically transform an encounter into a seizure. *See Holly*, 940 F.3d at 1001 (distinguishing the defendant's circumstances from those in *Smith* and explaining that even though the officer asked if the defendant had a weapon, the other circumstances of the encounter did not suggest coercion).

But while the encounter may have started off as consensual, it quickly escalated to a seizure when Zeman grabbed McKay's left hand and conducted a pat down search.[3] *See Scheets*,

---

[3] The Court rejects McKay's apparent contention that he was subject to a search incident to arrest rather than a frisk. An "investigative stop is a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in a criminal activity." *United States v. Boden*, 854 F.2d 983, 992 (7th Cir. 1988). But "when police actions create a situation that exceeds a short detainment, a stop becomes an arrest which requires probable cause that the person is committing or has committed a crime." *United States v. Yang*, 286 F.3d 940, 949–50 (7th Cir. 2002). Here, there is no question that McKay was subject to a frisk because it was only a matter of seconds between the time that Zeman grabbed McKay's left hand and when he patted down the area of the L-shaped bulge.

6

188 F.3d at 827 (stating that a consensual stop "can develop into an investigatory stop depending upon the conduct of the investigating officers"). Under the Fourth Amendment, law enforcement may conduct a brief investigative stop of a person but only if they have reasonable suspicion that the person is engaged in criminal activity. *United States v. Adair*, 925 F.3d 931, 935 (7th Cir. 2019) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). "While inarticulate hunches are not enough, reasonable suspicion is a lower threshold than probable cause and considerably less than preponderance of the evidence." *Id.* (internal quotation marks and citation omitted). The fact-intensive inquiry into whether a law enforcement officer had reasonable suspicion requires a court to "look to the totality of the circumstances to see whether police had a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Howell*, 958 F.3d 589, 597–98 (7th Cir. 2020) (internal quotation marks and alteration omitted).

During the course of an investigative stop, a law enforcement officer may conduct a frisk, or "a limited pat down of the suspect's outer clothing to search for weapons," but only if the officer "can 'point to specific and articulable facts' indicating 'that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous.'" *Id.* at 598 (quoting *Terry*, 392 U.S. at 21, 24–25). Unlike for a stop, the reasonable suspicion inquiry for a frisk includes an "additional armed-and-dangerous inquiry." *Id.* The Fourth Amendment requires that additional inquiry because "a frisk is more intrusive than a stop." *Id.*; *see also United States v. Lopez*, 907 F.3d 472, 485 (7th Cir. 2018) ("Even when a *Terry* stop is justified, whether a frisk is also justified is a separate question.").

Here, the Court finds that Zeman had reasonable suspicion to pat down McKay for weapons. First, the fact that the encounter occurred at night in an area known to the officers to be a high-crime area, while not sufficient on its own, supports the officers' reasonable suspicion. *See,*

*e.g.*, *Adair*, 925 F.3d at 936 (stating that the late hour and the setting in a high-crime area were pertinent factors in the reasonable suspicion analysis). Furthermore, McKay was one person in a group that was openly violating the law by drinking in public and smoking marijuana.[4] *United States v. Patton*, 705 F.3d 734, 739 (7th Cir. 2013) (finding that the officers' reasonable suspicion was supported by the fact that the defendant was among a group of men who were openly consuming alcohol); *see also United States v. Williams*, 731 F.3d 678, 688 (7th Cir. 2013) (noting in distinguishing *Patton* that the defendant in that case was "part of a group that was openly violating the law, even if he, himself, did not have a beer in his hand"). The Court credits Zeman's testimony that he could observe a black object protruding from McKay's waistband upon arriving on the scene. Zeman's body-camera footage reveals that, even before he turned on his flashlight, the area was amply lit by streetlights thus making it possible for him to observe an object in McKay's waistband. Then, Zeman saw McKay tuck that object further into his pants, which created an L-shaped bulge that resembled a gun. *See Adair*, 925 F.3d at 937–38 (accounting for the officer seeing a large bulge in the defendant's pocket in finding reasonable suspicion for a frisk); *United States v. Richmond*, 924 F.3d 404, 411 (7th Cir. 2019) (stating that a significant bulge in the defendant's front t-shirt pocket contributed to the officers' reasonable suspicion that the defendant was carrying a gun).

After Zeman asked McKay if he had a weapon on him, McKay walked away from the officer, looking in Zeman's direction at least twice. When he stopped, McKay positioned his body in a manner that effectively shielded the L-shaped bulge in his pants from Zeman's view. The Supreme Court has recognized that "nervous, evasive behavior is a pertinent factor in determining

---

[4] While Illinois has since legalized recreational use of marijuana, at the time of McKay's arrest it was still illegal. *See* Robert McCoppin, *Here's when marijuana will be legal in Illinois, and answers to other burning questions about recreational weed*, Chi. Trib. (June 25, 2019, 7:33 PM), https://www.chicagotribune.com/news/breaking/ct-met-cb-legal-marijuana-illinois-20190531-story.html.

reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). And here, McKay's actions were not the type of ordinary nervous behavior any person might exhibit when confronted by police. *See Williams*, 731 F.3d at 687 ("Most people, when confronted by a police officer, are likely to act nervous, avoid eye contact, and even potentially shift their bodies as if to move away from the area, thus making such behaviors of very little import to a reasonable suspicion determination."). Rather, McKay took several steps around the group of people that had been behind him. *See Patton*, 705 F.3d at 739 ("A half-step or step in the wrong direction might bespeak ordinary hesitation or confusion, but five steps suggests purposeful evasion . . . ."); *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2001) (citing the defendant's slow retreat from a larger group while looking from side to side as nervous or evasive behavior). By contrast, the other people in the group next to McKay remained where they were.

Finally, Zeman testified that he recognized McKay's stance shielding the bulge in his pants as "blading." In his law enforcement training, Zeman learned to angle his body when confronting a potentially dangerous suspect in such a manner as to shield his weapon. Thus, based on his training, it was reasonable for Zeman to conclude that McKay was positioning his body in a way to hide the L-shaped bulge. *See Oglesby*, 597 F.3d at 894–95 (finding that the officer's training "made it reasonable for him to infer" that the defendant's stance angling his body so as to obscure his right side from the officer's view "was potentially calculated to keep a weapon hidden or out of reach").

Taken together, the evidence demonstrates that the officers had reasonable suspicion to frisk McKay. During that frisk, Zeman felt a hard object consistent with a firearm near McKay's right thigh. Collazo then retrieved that object from McKay's pants, revealing it to be a pistol. Once McKay confirmed that McKay did not possess a proper permit for carrying that firearm, the

9

officers had probable cause to arrest McKay. Consequently, McKay's motion to suppress is denied.

## CONCLUSION

For the foregoing reasons, McKay's motion to quash arrest and suppress evidence illegally seized (Dkt. No. 17) is denied.

ENTERED:

Dated: October 20, 2020

Andrea R. Wood
United States District Judge

10